UNITED STATES DISTRCT COURT
EASTERN DISTRCT OF MISSOURI
EASTERN DIVISION

FILED
NOV 20 2024
U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | |
| ) | 4:24CR619 AGF/JMB |
| v. ) | |
| ) | |
| GEORGE S. PACE, ) | |
| Defendant. ) | |

### INDICTMENT

The Grand Jury charges that:

### INTRODUCTION

At all times material to this Indictment, unless otherwise specified below:

1. Defendant GEORGE S. PACE ("Pace") was a resident of St. Louis, Missouri. Beginning in 2018, Pace served on the Board of Directors of a non-profit circus, "CF," based in St. Louis, Missouri, in the Eastern District of Missouri. Pace subsequently became the President of the Board of Directors. The members of the Board of Directors are not compensated financially for their work for CF.

2. In addition to providing circus performances to the community, CF also does extensive community outreach, including by offering thousands of free tickets to underserved communities, and performing for hospitalized children and their families. A substantial source of CF's funding comes from donations.

3. Although CF had both a treasurer and an accountant, as President of the Board of Directors, Pace was given a significant degree of autonomy and access to CF's finances.

4. Beginning in 2022, CF maintained a $150,000 line of credit at Enterprise Bank

and Trust ("Enterprise Bank"). The line of credit was intended to provide operating cash flow to CF after it experienced a cash flow crunch in the wake of the COVID pandemic.

5. CF also had two credit cards issued by Enterprise Bank, one of which was held by CF's Executive Director, KP, and one of which was held by CF's Artistic Director, JM. At no point in time was Pace an authorized cardholder for CF's Enterprise Bank credit cards, nor was he permitted to use the credit cards for personal expenses.

6. In February of 2023, JM directed Pace to close the credit cards at Enterprise Bank, and to obtain a credit card through UMB Bank.

7. Pace maintained personal checking account #3215 and personal savings accounts #3231 at Bank of America. Deposits into Bank of America accounts from accounts held at other financial institutions were accomplished by means of interstate wire transmission.

## COUNTS 1-4
Wire Fraud (18 U.S.C. § 1343)

### The Scheme

8. The paragraphs above are realleged and incorporated by reference as if fully set forth herein.

9. Beginning no later than in or around December 2022, and continuing until through at least in or around September 2023, in the Eastern District of Missouri and elsewhere, the defendant,

### GEORGE S. PACE,

with intent to defraud, devised and intended to devise a scheme and artifice to defraud CF, and to obtain money and property from CF, by means of materially false and fraudulent pretenses, representations, and promises.

### Manner and Means

10. It was part of the scheme that without the knowledge or approval of CF, Pace

obtained an Enterprise Bank credit card held in his name but opened on CF's account.

11. It was part of the scheme that Pace falsely represented to CF that he had closed CF's credit cards at Enterprise Bank. In truth and fact, Pace closed the cards held in the names of CF's Artistic Director and the Executive Director, but, without CF's knowledge or approval, maintained his own CF Enterprise Bank credit card.

12. It was part of the scheme that Pace used his CF Enterprise Bank credit card to pay for thousands of dollars of personal expenses, including payments to nail salons, restaurants, and for skin care treatments.

13. It was part of the scheme that Pace obtained a UMB Bank credit card held in his name, but opened on the account of CF. CF had not authorized Pace to use this credit card for personal expenses.

14. It was part of the scheme that, as with the Enterprise Bank credit card, Pace used the UMB credit card to make thousands of dollars in unauthorized personal purchases, including horseback riding related expenses and payments to restaurants. Pace met with JM, CF's Artistic Director, each month to review his credit card expenses.

15. It was part of the scheme that in March 2023, Pace falsely told JM that his UMB credit card had been stolen, and that event accounted for the unauthorized purchases made using Pace's UMB credit card. Pace further falsely told JM that he had already contacted UMB Bank to resolve the fraudulent charges.

16. It was part of the scheme that Pace provided JM with forged account statements showing that Pace had resolved the fraudulent charges, when in truth and fact, he had not.

17. It was part of the scheme that Pace diverted over $50,000 in checks drawn on CF's Enterprise Bank account to himself, rather than using them to pay down CF's line of credit at Enterprise, as Pace falsely informed CF's Board of Directors he was doing. Pace's diversion of

the line of credit payments caused thousands of dollars in interest to be accrued by CF.

18. It was part of the scheme that Pace deposited thousands of dollars of donor checks made out to CF into his personal Bank of America accounts.

19. It was part of the scheme that, over the course of the scheme, Pace used the CF's Enterprise Bank line of credit, company credit cards and donor checks to defraud CF of over $120,000.

### Wirings in Furtherance of the Scheme

20. On or about the dates listed below, in the Eastern District of Missouri, and elsewhere, the defendant,

### GEORGE S. PACE,

having devised and intended to devise a scheme to defraud and to obtain money by means of materially false and fraudulent pretenses, representations, and promises, for the purpose of executing the scheme described above, caused to be transmitted by means of wire communication in interstate commerce certain signals and sounds, namely, Pace's deposit in the Eastern District of Missouri into his personal bank account(s) of the following CF donor checks drawn on financial institutions maintaining servers located outside the state of Missouri, as follows:

| Count | Deposit Date | Amount | Check Memo |
|---|---|---|---|
| 1 | 12/15/2022 | $250.00 | "2022 Donation" |
| 2 | 1/3/2023 | $500.00 | "Donation" |
| 3 | 2/23/2023 | $150.00 | "Donation" |
| 4 | 5/8/2023 | $250.00 | "CF 2023 Donation" |

All in violation of Title 18, United States Code, Section 1343.

### COUNTS 5-6
### CARES Act Wire Fraud Scheme
(Wire Fraud: 18 U.S.C. § 1343)

21. In or about August 2022, the defendant, George S. Pace, engaged in a scheme to obtain fraudulent Economic Injury Disaster Loans by means of materially false and fraudulent

pretenses, representations, and promises, and for the purpose of executing his scheme, caused the transmission of interstate wire transmissions.

### Economic Injury Disaster Loan Program Background

22. The Coronavirus Aid, Relief, and Economic Security Act ("The CARES Act") is a federal law enacted on March 27, 2020, designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. One source of funding for small businesses was the Economic Injury Disaster Loans ("EIDL").

23. The CARES Act and subsequent legislation, enacted between on or about December 27, 2020, and on or about March 11, 2021, allocated billions of dollars in COVID-related EIDL funding. The CARES Act and subsequent legislation also authorized the Small Business Administration ("SBA") to provide EIDLs of up to $2 million to eligible small businesses experiencing substantial financial disruptions due to the COVID-19 pandemic. In addition, the CARES Act and subsequent legislation authorized the SBA to issue advances of up to $10,000 to small businesses within three days of applying for an EIDL.

24. In order to obtain an EIDL and advance, a qualifying business was required to submit an application to the SBA and provide information about its operations, such as the number of employees, gross revenue for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster. In the case of EIDLs for COVID-19 relief, the 12-month period was the period preceding January 31, 2020. For a business to be eligible for an EIDL, the business must have been in operation before February 1, 2020. The applicant was also required to certify that all of the information in the application was true and correct to the best of the applicant's knowledge.

25. All EIDL applications were submitted online. All applications submitted on July

11, 2020 or after were handled by an SBA contractor with servers located in Des Moines, Iowa. Approval of a loan application and the amount of a loan was based, in part, on the information provided on the application about the number of employees, gross revenue, and cost of goods, as described above. The EIDL loan applications required minimal documentation and information from small businesses to process the loan for approval.

26. Once an SBA EIDL application is approved, the SBA's Denver Finance Center, located in Denver, Colorado, created payment files and authorized payments of the EIDL funds based on those applications. The disbursement of the EIDL funds were transmitted by the Financial Management System ("FMS") to the Treasury and then to the recipient's bank account. The primary server for the FMS is in Sterling, VA. Upon approval of an application for an EIDL or advance, SBA would disburse the funds. EIDL loan proceeds were permitted to be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments.

### Manner and Means of the Scheme

27. It was part of the scheme that on or about August 9, 2022, Pace applied for a sole proprietor EIDL loan in the amount of $18,200. In support of that loan application, Pace submitted a forged bank account statement from his personal Bank of America checking account #3215. The account statement submitted by Pace materially misrepresented his August 8, 2022 account balance, showing a balance of $30,100.20. In truth and fact, Pace's #3215 account balance on that date was $165.84.

28. It was part of the scheme that on or about August 20, 2022, Pace applied for a second sole proprietor EIDL loan, this one in the amount of $11,200. In support of that loan application, Pace again submitted a forged bank account statement from his personal Bank of America checking account #3215. The account statement submitted by Pace materially

misrepresented his August 8, 2022 account balance, showing a balance of $30,100.20. In truth and fact, Pace's #3215 account balance on that date was $165.84.

### Wirings in Furtherance of the Scheme

29. On or about the dates listed below, in the Eastern District of Missouri, and elsewhere, the defendant,

**GEORGE PACE**,

having devised and intended to devise a scheme to defraud and to obtain money by means of materially false and fraudulent pretenses, representations, and promises, for the purpose of executing the scheme described above, caused to be transmitted by means of wire communication in interstate commerce certain signals and sounds, namely, Pace's transmission of fraudulent EIDL and PPP loan applications, as follows:

| Count | Date | Transmission | Amount |
|---|---|---|---|
| 5 | 8/9/2022 | EIDL Loan Application for loan #4000574102 | $18,200 |
| 6 | 8/20/2022 | EIDL Loan Application for loan # 4000579765 | $11,200 |

All in violation of Title 18, United States Code, Section 1343.

### FORFEITURE ALLEGATION

The Grand Jury further alleges that:

1. Pursuant to Title 18, United State Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, upon conviction of an offense in violation of Title 18, United States Code, Section 1343, as set forth in Counts 1-6, the Defendant shall forfeit to the United States of America any property, real or personal, which constitutes or is derived from proceeds traceable to such violation(s).

2. Subject to forfeiture is a sum of money equal to the total value of any property, real or personal, constituting or derived from any proceeds traceable to such violation(s).

3. If any of the property described above, as a result of any act or omission of the Defendant:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be divided without difficulty,

the United States of America will be entitled to the forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

A TRUE BILL.

_____

FOREPERSON

SAYLER A. FLEMING
United States Attorney

_____
Gwendolyn E. Carroll #4657003NY
Assistant United States Attorney